## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA WILLIS LUHN, an individual
c/o 2020 Pennsylvania Ave NW #800
Washington, DC 20006

              Plaintiff

      v.

SUZANNE GUNDERSON SCOTT,
Individually
24 Homewood Drive
Morristown, NJ 07960

And

THE FOX CORPORATION,
dba Fox News Channel
c/o 400 N. Capitol Street NW, #550
Washington, DC 20001

           Defendants.

**Case Number:**

**VERIFIED COMPLAINT**

### INTRODUCTION

Plaintiff, LAURA WILLIS LUHN ("Plaintiff" or "Luhn") hereby files this action against

SUZANNE GUNDERSON SCOTT ("Defendant Scott") and THE FOX CORPORATION, dba

Fox News Channel ("FNC") for Defamation and False Light.

### JURISDICTION AND VENUE

1.    This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332,

as the parties are completely diverse in citizenship and the amount in controversy exceeds

$75,000.

2.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (3) in that a substantial part

of the events or omissions giving rise to Plaintiff Corsi's claims arose herein.

## THE PARTIES

3.      Plaintiff Luhn is an individual, natural person who is a citizen and resident of California Plaintiff is not a public figure.

4.      Defendant Suzanne Scott is an individual and a citizen and resident of New Jersey. Defendant Scott is the Chief Executive Office of Defendant FNC.

5.      Defendant The Fox Corporation, dba Fox News Channel, has a major bureau in Washington D.C. and does a substantial portion of its business in Washington D.C. It also broadcasts daily into the District of Columbia, in part to influence decisionmakers in this district.

## STANDING

6.      Plaintiff Luhn has standing to bring this action because she has been directly and actually affected and victimized by the unlawful conduct complained herein. Her injuries are proximately related to the misconduct of Defendants, each and every one of them, jointly and severally.

## GENERAL ALLEGATIONS

7.      Defendant Scott was appointed as the CEO of Defendant FNC in May of 2018 after former CEO Roger Ailes ("Ailes") was ousted in 2016 due to sexual harassment and abuse charges.[1]

8.      As reported by The Guardian, "many are concerned that Scott is a member of Fox's old guard and her appointment is not a break from the toxic workplace culture that led to so many harassment and discrimination claims being made."[2]

9.      Furthermore, "[Defendant] Scott herself is mired in the many harassment claims.

---

[1] Sam Wolfson, *Meet Suzanne Scott: the new Fox News CEO who enforced 'miniskirt rule*, The Guardian, May 17, 2018, available at: https://www.theguardian.com/media/2018/may/17/suzanne-scott-who-is-she-fox-news-ceo-female-miniskirt-rule.
[2] *Id.*

Staff were apparently aghast when she was promoted last year, as she had been the executive tasked with enforcing Ailes's miniskirt dress code for women. One anonymous former staff member told the Daily Beast how Scott would enforce a "skimpy" dress code in coordination with the wardrobe and makeup departments."[3]

10.    The Guardian also reported that "[Defendant] Scott is also cited in lawsuits brought by the former Fox News staffers Andrea Tantaros and Julie Roginsky, as one of the executives at the company who either did not respond to or covered up their complaints of harassment."[4]

11.    In an article published by the Los Angeles Times, written by Stephen Battaglia, Defendant Scott made false, malicious, and defamatory statements about Plaintiff Luhn which also held her in a false light, who was the victim of a decades long pattern and practice of sexual, psychological, emotional  and physical abuse by Ailes. See Exhibit 1, which is incorporated herein in whole by reference.

12.    The Los Angeles Times article reported that Defendant Scott told FNC employees that "she had no knowledge of Ailes' behavior even though she was part of his inner circle." Exhibit 1.

13.    Defendant Scott was quoted as saying, "I had no clue on what was going on in Roger Ailes' office…. I have never had any issues with any sort of harassment myself." Exhibit 1.

14.    These are provably false statements of fact that were made by Defendant Scott to defame, discredit, smear and hold Plaintiff Luhn in a false light, who had previously filed a lawsuit in the Superior Court for Los Angeles County and then U.S. District Court for the

---

[3] *Id.*
[4] *Id.*

District of Delaware (the "Delaware Case") detailing the decades-long abuse that she endured at the hands of Ailes, and which was covered up in part by Defendant Scott. *See Luhn v. Showtime Inc., et al*, 1:19-cv-618 (D. Del.); *Luhn v. Showtime Inc., et al*, 19SMCV00110 (Los Angeles Sup. Ct.). Press releases announcing these cases were sent to Scott and FNC, detailing Plaintiff Luhn's allegations in suits filed against Showtime, Blumhouse TV, LLC, and the writer of the upcoming eight part mini-series "Loudest Voice in the Room," where A list actress Annabelle Wallace portrays Plaintiff Laura Luhn. This eight-part mini-series is currently scheduled to air on Showtime June 30, 2019, with the first episode.

15.     Thus, Plaintiff Luhn had directly informed Defendant Scott of the allegations in the Los Angeles and Delaware Cases even before they were filed, and had sent out press releases regarding the Delaware Case. Exhibit 2.

16.     Thus, at a minimum, Defendant Scott was aware of the allegations by Plaintiff Luhn, and was much more directly involved in the cover-up of Ailes' conduct and served as an "enabler" to Ailes' conduct in this regard. Defendant Scott aided and abetted in the sexual abuse cover up.

17.     By making the provably false statement that she was not aware of any of Ailes' sexual harassment, Defendant Scott has defamed, smeared and discredited Plaintiff Luhn by calling her a liar and creating the false implication that Plaintiff Luhn fabricated sexual assault allegations against Ailes.

18.     This is especially damaging when Plaintiff Luhn's allegations are not only a matter of public record, but have been publicized and broadcasted by media outlets in this district, nationwide and internationally.

19.     Defendant Scott's statements have severely harmed Plaintiff Luhn's reputation for

honesty and subjected her to ridicule and shame by falsely portraying her as a someone who fabricates sexual assault allegations.

20.     In *Keeton v. Hustler, Inc.*, 465 U.S. 770 (1984), the plaintiff was a resident of New York, who brought a defamation case in New Hampshire against the defendant magazine, which was an Ohio corporation. *Id.* at 772. The only connection that the defendant had to New Hampshire was that the magazine had circulation in New Hampshire. *Id.* The Supreme Court held that the publisher of a national magazine was subject to jurisdiction in every location in which it was circulated, even if "the bulk of the harm done to petitioner occurred outside [the forum]." Jurisdiction in this district is even more pronounced, as Scott runs and manages and FNC has a major bureau in this district, which is one of two major broadcasting centers for FNC.

21.     Defendant Scott's false, malicious and defamatory statements have caused Plaintiff Luhn severe harm, as she now seeks to recover from her decades long cycle of abuse at the hands of Ailes, as detailed below. During this time period, which continues to the present, Plaintiff Luhn has been caused to suffer severe emotional distress, physical ailments and PTSD, to such an extent that she has attempted to commit suicide on at least two occasions. The actions of Defendants Scott and FNC, as set forth herein, have again thrust Plaintiff Luhn to the brink of suicide. This severe if not potentially fatal damage is particularly extreme and emotionally charged by the fact that a fellow woman, Defendant Scott, is so callous and uncaring in the eyes of Plaintiff Luhn, that this FNC CEO, Ailes' replacement and enabler, would continue to cover-up the truth and continue to profit from her position at FNC.

22.     Furthermore, to add insult to severe injury, it was reported back to Plaintiff Luhn that Defendant Scott tried to poison Plaintiff's relationship to staff.

23.     Discovery in furtherance of this lawsuit, whereby Plaintiff Luhn will subpoena

material witnesses who know of and will confirm the truth, along with documentation including by not limited to emails, text messages and internal FNC records and other documents and records, will prove this continuing cover-up by Defendants Scott and FNC. For instance, material witnesses such as John Moody, and also Jack Abernathy the latter of whom also informed Plaintiff Luhn that Defendant Scott was "running some strange invoices" on her expense accounts, most likely in furtherance of pay offs to persons who would otherwise reveal the truth, will be forced to testify about the cover-up, for which on information and belief there is an on-going grand jury investigation by the U.S. Attorney for the Southern District of New York. In this regard, it has been reported that FNC paid out about 123 million USD in settlements to women who were sexually harassed and abused by Ailes to keep them quiet, which payments were hidden from shareholders and the public at large. Plaintiff Scott knew of and on information and belief participated  in and furthered these secret payouts.

24.     On information and belief there were also cover-ups which Defendant Scott knew of concerning child porn usage at the Washington, D.C Bureau of FNC, which Defendants Scott and FNC covered-up.

25.     In sum, and as set forth below, Defendants Scott and FNC have engaged in a criminal enterprise to further their financial well-being by covering up the sexual abuse and discrimination that was and on information and belief remains rampant at the network. In so doing, persons like Plaintiff Luhn had to be silenced through coercion, intimidation and threats, notwithstanding overt acts designed to destroy them through defamation by ruining their reputations and subjecting them to extreme emotional distress with resulting physical ailments, which could even in Luhn's case result in suicide.

**FACTS PERTAINING TO ABUSE**

26.     Plaintiff was a part of the original staff which launched the Fox News Channel.

27.     Plaintiff met Ailes in the summer of 1988 at the Washington, D.C. headquarters of the George H.W. Bush presidential campaign while she was on the staff at the campaign.

28.     Plaintiff spent almost 15 years working for Fox News beginning on August 12, 1996 as a Guest Relations staffer for *Fox News Sunday with Tony Snow.* Plaintiff was part of the original staff that launched the Fox News Channel and was based in the Washington Bureau. Later, Plaintiff was promoted to Associate Producer/Guest Producer and was part of the *Special Report with Brit Hume* staff during the Kenneth Starr investigation and former president Bill Clinton impeachment proceedings. Plaintiff later became the Director of Booking for the Fox News Channel that included managing staff in both Washington, D.C. and New York City. In 2007, Plaintiff was promoted to Senior Director of Corporate and Special Events. This new position required commuting weekly to New York City working on the VIP launch event for the Fox Business Network hosted by Executive Chairman of News Corp, Rupert Murdoch, held in October at the Metropolitan Museum of Art in New York City.

29.     In the early years of Fox News, Defendant Scott sat at the secretarial section directly outside of Ailes' office and was one of his gatekeepers.

30.     During the entirety of Plaintiff's time on staff at Fox News, Ailes demanded, coerced, extorted, blackmailed and forced sexual favors from her, making impossible, frightening, dangerous and unrealistic demands and using abusive mind control techniques that he referred to as her "training." Ailes had bragged that he conducted training at the Central Intelligence Agency ("CIA") and this was his way to keep "Plaintiff in line and loyal to him." He would periodically call her in Washington telling her he felt her slipping up and that she needed more "training."

31.     The immensely powerful Ailes always reinforced to Plaintiff that she was to tell no one about what she considered his abusive and threatening tactics and demands, which is why she remained very fearful of Ailes' promised retribution during her tenure with Fox News. Ailes told her to think of it as the military and that she was expected to follow orders. The "orders" were implied in every aspect of the Plaintiff's work life and personal life. Ailes required Plaintiff "to report in" anything she had heard or seen that he would find "useful."

32.     Plaintiff was told to follow orders like "G.I. Jane" and act like Doris Day.

33.     Plaintiff was forced to purchase black garters and stockings to wear for Ailes, which he called her "uniform." He required her to leave her job in the middle of the day and meet him in various hotel rooms requiring her to wear the "uniform." This was particularly painful, humiliating, and embarrassing to Plaintiff, as she was booking guests for a show and had to excuse herself, falsely telling the producers she felt ill. Ailes constantly reminded Plaintiff, "I own you."

34.     Plaintiff would often pass John Moody, Senior Vice President of Editorial on the street while heading to meet Ailes at a hotel in Times Square.

35.     When Plaintiff received a promotion in June of 2004, Ailes told her she needed to "thank him" as a *quid pro quo*. While in his office at Fox News Headquarters ("HQ"), Ailes told Plaintiff to go to the Doubletree Hotel in Times Square, put on her "uniform" and thank him for the promotion. Ailes forced Plaintiff to meet him at the hotel and perform oral sex in order to thank him for the promotion, continuing to manipulate Plaintiff. As the promotion was explained to Plaintiff, she would no longer report to Kim Hume, the Washington DC Bureau Chief. Ailes told her that she would be reporting to New York – specifically to Bill Shine. That actually included anyone from management on the second floor of the Fox News Headquarters ("HQ"),

usually Suzanne Scott, but also Kevin Magee, Irene Briganti, Judy Laterza and others.

36.     A telephone call or email from anyone in Ailes' inner circle came with the understanding that it was what Ailes wanted, implying "following orders" no matter the consequence. It was absolutely understood that you were never to question orders. This created an atmosphere of mistrust toward Plaintiff, especially while try to function in her new role as Manager of Booking, operating in a hostile environment in the Washington D.C. Bureau.

37.     Instead of using the Fox Travel Department, Ailes required Plaintiff to make her own hotel arrangements. Ailes was adamant that Plaintiff not stay at the Muse Hotel, where most of the Fox staff stayed. Plaintiff was expected to contact directly the Doubletree at Times Square, the Renaissance Hotel Times Square or the Omni Berkshire. Ailes ordered that Plaintiff stay at hotels that he had concluded were "safe" and convenient for him. This caused further embarrassment and humiliation for Plaintiff with questions raised concerning her hotel arrangements.

38.     However "safe" Ailes had concluded the Doubletree was for him, Plaintiff was informed by a co-worker, Jama Vitale, in November 2006, almost 2 ½ years after the June 2004 promotion, that Peter Zorich, nephew to Michael Dukakis and a producer in the New York bureau, had witnessed Ailes leave the hotel and a few minutes later, had seen Plaintiff depart.

39.     Plaintiff was unaware of Zorich, but had run into Cal Thomas, a Fox News Contributor while departing to take a cab to the airport. Ailes later told Plaintiff that he had visited with Cal Thomas in the hotel lobby when departing.

40.     It is noteworthy that by October 2004, Ailes was embroiled in a sexual harassment lawsuit filed by Fox News Channel producer Andrea Mackris against Bill O'Reilly. After settling, the Andrea Mackris situation had terrified Ailes and his inner circle just enough to

preempt any perceived threat or future litigation from Plaintiff Luhn.

41.     It was as if the entire Ailes inner circle employed tactics to "discredit" Plaintiff right after the Mackris fallout. This created an impossible work environment for Plaintiff, whom they had set up to fail.

42.     This pattern of conduct by Ailes fueled harmful gossip in New York and Washington D.C., further alienating Plaintiff Luhn from her co-workers and the management of Fox News. Ailes' threatening brazenness and arrogance escalated as the years went on, and the demands became more frightening. Ailes manipulated and threatened Plaintiff, reminding her that he kept the compromising photographs and videos that he had taken of her in a safe-deposit box and that they were his "insurance policy" so that she would remain both silent and loyal to him. Blackmailed, and with no realistic options to get away from his predatory and threatening behavior, Plaintiff felt boxed in with no choice but to comply when he ordered her to meet him in a hotel room. The abusive and intense mind control techniques were most effective and she had no choice but to trust the man who told her that he was her only friend. Plaintiff was required to consistently pledge her loyalty to Roger Ailes, playing on the Plaintiff's extremely vulnerable position.

43.     While this abusive behavior continued, Ailes continued to also play the role of "mentor" to Plaintiff, which was confusing to Plaintiff and meant to keep her off balance. Yet, she was expected to follow his orders, no matter how outrageous.

44.     There was a period of time after the terror attacks on September 11, 2001 when Ailes told Plaintiff Luhn that he had a "friend" he wanted her to meet. The "friend" was a woman he had brought to a suite at the Renaissance Hotel in Times Square. Plaintiff was asked to perform 3-way sex with Ailes and his "friend." Plaintiff recalls Ailes being threatening and

forceful. She was terrified and remains traumatized to this day from the experience. There were at least three other meetings in New York hotel rooms with his "friend." The last meeting that Plaintiff recalls took place at the Omni Berkshire Hotel in New York in October 2005. Plaintiff recalls Ailes with a camera on that day. She will never forget the trauma and sickness she felt when she saw him photograph her with that woman. Ailes often reminded the Plaintiff of his "loyalty requirement" and of his collection of compromising photographs of the emotionally shattered Luhn that he "owned." Ailes kept screaming to Plaintiff, "get in there Laurie!" and violently shoving her into his "friend."

45.     Ailes photographed, coerced, blackmailed, extorted and threatened Plaintiff in Mafioso fashion for twenty years. He disseminated false statements and smears to both the management, on-air talent and staff of Fox News, defaming Plaintiff. Ailes used character assassination to damage Plaintiff's reputation and intentionally gave false statements about Plaintiff to the media in an effort to create confusion and deflect from his two decades long sexual harassment and abuse of Plaintiff. Ailes monitored, harassed and gaslit Plaintiff Luhn, and along with his aides, drove her into a deeply depressed mental state causing severe mental anguish and emotional distress. Defendant Scott participated in this and furthered this by, among many other acts, pressuring Plaintiff Luhn to sell her coop apartment at 4000 Cathedral Avenue, N.W., Unit 729 B, to compel her to move to New York City, where it would be easier to monitor and spy on her as part of the on-going cover-up.

46.     Ailes hired contractors (which were overseen by one of the Vice Presidents of Fox News, Warren Vandeveer to install a very large unusual brass lock that could be accessed by a fingerprint and a separate key to Plaintiff's front door at her Westchester apartment in Washington, D.C., located at 4000 Cathedral Avenue, NW, Apartment 729B. Curious neighbors

questioned Plaintiff about the lock. It was obtrusive and unlike the standard building locks for the Westchester. It was another embarrassing and humiliating experience for the Plaintiff to endure. Ailes was completely oblivious to Plaintiff's continuing pain, humiliation and trauma. Ailes told her falsely that it was for her security and protection. However, Plaintiff's apartment continued to be ransacked regularly.

47.     At one point during her tenure at Fox News, Ailes told Plaintiff to cut off contact with both staff in the Fox News Washington, D.C. bureau and her personal friends, ordered her to sell her co-op apartment in Washington, D.C. and move to New York in order for him to monitor her and control and use her. Plaintiff was a classic victim of Stockholm Syndrome. This was part of a diagnosis by Plaintiff's psychiatrist, and one that she has continued to suffer as a result of years of abuse and conflicting messages from Ailes.

48.     Ailes would call Plaintiff at her desk in Washington and demand phone sex.

49.     Ailes continuously told Plaintiff that she had "no friends" and that he was her only friend in the world. "I'll protect you," Ailes told Plaintiff. "You need to do this for me, stay quiet and show your loyalty, Laurie." Ailes continued to threaten Plaintiff by telling her not to trust anyone with the exception of Ailes' inner circle at Fox News, which included Judy Laterza, Michael Tammero, Brian Lewis,  Bill Shine, and Defendant Scott.

50.     In fact, Defendant Scott was tasked with constantly monitoring Plaintiff Luhn, which included weekly lunches as status reports to Ailes. Luhn was constantly questioned about why her apartment had not sold.

51.      Ailes had installed Plaintiff in the Washington Bureau of Fox News in 1996, telling her that she would be his "eyes and ears in Washington." Ailes required Plaintiff to report to him any signs of what he called "disloyalty" within the management, staff, and on-air talent of

Fox News, and that included anyone who did not fall in line with Ailes' editorial agenda. This later included on-air guests that Ailes deemed unsuitable because of their particular views on policy, whatever may be the topic at hand or his whim. Ailes was an extremely vindictive and mean person towards guests who "displeased" him for any reason. It was an unwritten policy that got so out of hand, Plaintiff lost her job as Director of Booking due to an impending expose by Brody Mullins of *The Wall Street Journal* and what became not so fondly known as Ailes' "blacklisting" of guests appearing on Fox News. It was a huge controversy at the time. *The Wall Street Journal* did not run the piece because Plaintiff was removed from the news division and was considered no longer "relevant " or "useful"  according to Ailes.

52.     Media Relations Vice President Irena Briganti told Plaintiff that she would need to be removed from the Booking Unit because of the rumors and gossip surrounding the Plaintiff and Ailes. The Media Relations Department and the very volatile and paranoid Ailes were making every effort to stop *The Wall Street Journal* from publishing this expose on Fox News "blacklisting" because it would no doubt put the entire operation and Ailes' culture under close scrutiny for their disreputable editorial approach and the highly abusive Ailes/Luhn relationship. Here, it was actually Briganti, not her supervisor Bill Shine, who effectively removed Plaintiff from her position as Director of Booking in a preemptive move to (always) protect her boss (Ailes) from scrutiny and negative press or exposure, no matter the collateral damage, the lies that were told, the extent of the cover-up, or the lives that were destroyed. As part of a larger strategy and reflective of the "culture" of Fox News, Ailes tasked the Media Relations Department with the role of smearing and discrediting Plaintiff. This provided Ailes "cover" and plausible deniability since he could not be held responsible for "whispers to the media."

53.     The removal of Plaintiff from the news division was severely traumatic as it was

actually a cover-up for Ailes' crimes perpetrated against her. With his tremendous power and influence, Ailes was able to shift the focus and kill the Wall Street Journal piece in an effort to deflect from his sexual abuse. Ailes had always used Fox News programming and editorial content to impose his own political views and biases; settling scores with enemies, real or perceived. Ailes installed Fox News Contributors agreeable to those views that he deemed "loyal" and paid them handsomely. He skillfully shielded himself from many of the attacks. He depended on his inner circle of loyal lieutenants, including some of the on-air talent and contributors as layers of protection from negative press. He seemed to treat character assassination like a game, one that he was well-skilled at and quite enjoyed. He even employed his personal attorney, Peter Johnson, Jr. as a Fox News Contributor.

54.     Plaintiff had been referred to as "Roger's spy" since the early days of Fox News, both within the organization and in the greater political and journalistic community. Plaintiff suffered greatly by this designation and the continuing gossip and innuendo that permanently damaged the Plaintiff's reputation – never to be recovered – as she has endured unimaginable pain and sadness, while at the same time being defamed, including loss of family relationships that have been permanently destroyed.

55.     Ailes also utilized Fox News' Management and Media Relations Department to monitor, harass, threaten, and gaslight Plaintiff. Ailes made a management decision to destroy both Plaintiff's confidence and reputation in an effort to completely "discredit" her as a future witness against Ailes' illegal acts and sexual abuse.

56.     For twenty years, Ailes threatened Plaintiff by telling her, "I own you."

57.     Starting in 2006 and into 2007, Plaintiff had a stalker. Ailes fueled her fear and  kept her terrified by telling her she should not stay in her Washington D.C. co-op apartment

that she owned. Ailes had her stay at the Warwick Hotel in New York under the name Suzanne Scott, who is today the CEO of Fox News. It was a frightening and harrowing experience where Ailes required Plaintiff to cut off all communication with everyone, even old, personal friends. Ailes forced Plaintiff to provide all incoming and outgoing emails to him for "approval." He even dictated responses for the Plaintiff to send. It was classic Ailes - making the Plaintiff feel owned, controlled and completely dependent on him. Plaintiff was fearful because the stalker had been ransacking her Washington D.C. apartment on a regular basis. Ailes told the Plaintiff that George Soros and Hillary Clinton were trying to kill her.

58.     Ailes had constantly demanded what he referred to as "loyalty" and forbade Plaintiff from telling her Washington D.C. psychiatrist – Dr. David Fischer - friends or family about the constant sexual, emotional and psychological abuse. She remained silent for 20 years, becoming deeply depressed by keeping the destructive abuse she endured bottled up inside, resulting in humiliation and embarrassment. The traumatized Plaintiff was completely isolated from Fox News staff and remained a prime target for painful malicious gossip and rumors, eventually driving her from Washington D.C. and moving to Los Angeles in 2011. Ailes exploited the Plaintiff's vulnerable position and dependency on him – intentionally keeping her off balance through his destructive mind control techniques, Mafioso tactics, gaslighting and harassment by his aides, causing severe psychological damage.

59.     Ailes threatened, harassed and questioned Plaintiff about every aspect of her life. This included probing her personal life and constantly instructing her on whom she could "trust," whom she could have as friends, including forcing her to cut off existing relationships with friends and colleagues. Ailes was very insistent for years that the Plaintiff could not trust anyone. Therefore, this resulted in complete isolation both from within Fox News and the community as

a whole. Roger Ailes was guilty of a decades-long obsession with Plaintiff Luhn. This obsession was sadistic and proved dangerous and highly toxic to the Plaintiff.

60.    Fox News senior staff, including CFO Jack Abernathy and SVP Editorial John Moody were aware of Ailes' obsession with Plaintiff Luhn.

61.    In 2011, Bill Shine, Ailes' right-hand man – at the direction of Ailes – ordered Plaintiff to vacate her apartment – with zero notice – in Los Angeles. This event took place a few days after *The New York Times* published a page one story on February 24, 2011 about Roger Ailes urging Judith Regan to lie to federal investigators regarding a cover-up involving key figures, such as Bernard Kerik of the 9/11 terror attacks.

62.    Shine hired Pinkerton Security and sent Plaintiff to her family home in San Antonio, telling her that the Los Angeles ("LA") apartment had to be checked out due to stalkers. Ailes had continued to tell the Plaintiff that George Soros was trying to kill her, which kept her terrified because she was being terrorized at the LA apartment. During her stay with her parents, Bill Shine, Ailes' top deputy, sent Plaintiff to a handpicked psychiatrist based at the University of Texas Health Science Center in an effort to manipulate and prevent her from speaking out about the sexual and psychological abuse.

63.    While in San Antonio, Plaintiff contacted the office of the Attorney General of the United States, Eric Holder, on the telephone. It is noteworthy that there were rumors online and in the press that Roger Ailes was to be indicted, which terrified the Plaintiff because she was tied to him. Plaintiff explained that she would like to have a confidential conversation with Holder regarding Fox News. Mr. Holder's assistant would not put the call through to the Attorney General. Instead, Plaintiff was directed to meet with First Assistant U.S. Attorney Jim Blankenship ("Blankenship") in San Antonio. A very shaken and frightened Plaintiff spent time

outlining in graphic detail the years of abuse and psychosexual torture that she endured at the hands of Ailes.

64.     Blankenship, a George H.W. Bush appointee, and his aide, were dismissive and did not take her seriously or make any effort to follow up on the very serious claims regarding Ailes. The meeting was cut short when the Shine-picked psychiatrist, Dr. Camis Milam ("Dr. Milam"), called her out of the meeting while she was in the U.S. Attorney's office in San Antonio. On the telephone, Dr. Milam threatened to admit the Plaintiff to the hospital psych ward that very night if she did not leave immediately.

65.      In fact, the doctor admitted Plaintiff to the psychiatric ward at a mental hospital 48 hours later. Dr. Milam scolded the Plaintiff for contacting the U.S. Department of Justice. Both Bill Shine and Dianne Brandi, Legal Counsel for Fox News, were in direct and constant contact with Dr. Milam – including issuing threats to the Plaintiff and scolding her for contacting Jamie Vitale, a co-worker at Fox News. The email was forwarded to Dr. Milam.

66.     This was part of Ailes' strategy to paint Plaintiff as "crazy, delusional, and paranoid" and to discredit any possible testimony regarding his psychological and sexual abuse. As acts of intimidation, Bill Shine also frequently called Plaintiff's father during this time asking questions about her.

67.     When Plaintiff returned to her LA apartment, Dr. Milam indirectly referred Plaintiff to an attorney in order to negotiate settlement with Fox News.

68.     However, Fox News executives knew that Plaintiff was in no mental or emotional condition to negotiate settlement, as she was on serious medication that prevented her from having a clear head or thinking logically. Plaintiff was traumatized and frightened of a media spectacle if she filed suit against Fox News.

69.     Plaintiff never received proper assistance of counsel, as she was pressured and deceived, if not fraudulently induced, into settlement by the unethically conflicted attorney who was referred indirectly by Dr. Milam – who was working in concert with Fox News – when Plaintiff really needed to file a legal action. No legal action was ever filed, and Plaintiff, in a heavily medicated, hazy, and foggy mental state, was pressured, coerced and fraudulently induced into agreeing to settlement.

70.     The entire "settlement" process was rushed through and slapped together extremely quickly by Ailes, Dianne Brandi, and Plaintiff's attorney, all working closely together.

71.     Plaintiff has suffered and continues to suffer serious, debilitating and life threatening trauma, anxiety and other serious health complications as a result of Ailes' severe psychological torture and mind control. This was covered up and furthered by his inner circle, including but not limited to Judy Laterza, Bill Shine, Brian Lewis, Irena Briganti and Suzanne Scott. Emotionally shattered and deeply depressed by her tragic experience with Ailes and Fox News and a with destroyed reputation, Plaintiff twice attempted suicide and to this day continues to be severely damaged with PTSD and bouts of intermittent anxiety and hopelessness. She continues to feel isolated and ostracized by society. The long-term impact and severe damage caused by Ailes' mind control techniques, and the cover-up and complicity of his abovementioned top aides, and the resulting Stockholm Syndrome still gripping and strangling the Plaintiff is incalculable. Plaintiff has never been able to reach closure through this ongoing painful process of defamation, a tragedy resulting in loss of income and any chance of a healthy existence.

72.     After Ailes resigned in 2016, Plaintiff called Michele Hirshman of Paul Weiss, Rifkind, Wharton & Garrison LLP, the New York law firm hired by 21st Century Fox to investigate sexual-harassment allegations against him.

73.     Plaintiff sent to an email Hirshman, terrified by the gaslighting and attacks after Gretchen Carlson filed suit against Ailes.

## FIRST CAUSE OF ACTION
### *Defamation*

74.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

75.     Defendant Scott, on behalf of and in concert with Defendant FNC, published malicious, false, misleading and defamatory statements of and concerning Plaintiff Luhn in this judicial district, nationwide, and worldwide.

76.     These false and misleading statements were published with malice, as Defendant Scott knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

77.     Plaintiff Luhn has been severely harmed and damaged by these false and misleading statements because they subjected her to hatred, distrust, ridicule, contempt, and disgrace.

## SECOND CAUSE OF ACTION
### *Defamation by Implication*

78.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

79.     Defendant Scott, on behalf of and in concert with Defendant FNC, published numerous false, misleading and defamatory statements about Plaintiff Luhn as set forth in the preceding paragraphs.

80.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and for the entire world to see and hear.

81.     These false and misleading statements were published with malice, as Defendant Scott knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

82.     These statements created the false and misleading implication that Plaintiff Luhn is dishonest and fabricated allegations of sexual abuse against Ailes.

83.     Plaintiff Luhn has been severely harmed and damaged by these false and misleading statements because they subject her to hatred, distrust, ridicule, contempt, and disgrace.

### THIRD CAUSE OF ACTION
#### *False Light*

84.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

85.     Defendant Scott, in concert with Defendant FNC, knowingly made false statements, representations, or imputations about Plaintiff Luhn that she was a liar who had fabricated sexual harassment allegations against Ailes.

86.     Defendant Scott's statements were all made in public, and were foreseeably published and disseminated through various media outlets to persons all across the world, and were reasonably understood to be of or concerning Plaintiff Luhn.

87.     Defendant Scott's statements about Luhn implying that Luhn was dishonest and fabricated sexual assault allegations placed Plaintiff Luhn in a false light that would be offensive to a reasonable person.

88.     As a direct and proximate result of Defendant Scott's statements, Plaintiff has suffered pecuniary damage, as well as injury to reputation, impairment to standing in the community, personal humiliation, pain and suffering,  emotional distress and physical ailments.

## FOURTH CAUSE OF ACTION
### *Intentional Infliction of Emotional Distress*

89.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

90.     Defendants engaged in extreme and outrageous conduct by falsely calling Plaintiff Luhn a liar and creating the implication that she fabricated sexual assault allegations against Ailes.

91.     Plaintiff did not consent to Defendants' conduct.

92.     Defendants' extreme and outrageous conduct directly caused Plaintiff Luhn severe emotional distress and resulting severe harm and damage, including reoccurring thoughts of attempted suicide.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Laura Willis Luhn prays for judgment against Defendants as follows:

a.     Awarding Plaintiff compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct in an amount to be determined at trial and in excess of $120,000,000 U.S. Dollars.

b.     Awarding Plaintiff attorney's fees and costs.

c.     Granting any further relief as the Court deems appropriate, including but not limited to injunctive relief.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS TRIABLE.

Dated: April 23, 2019                                    Respectfully Submitted,


                                                            */s/ Larry Klayman*

Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
D.C.  Bar Number: 334581
2020 Pennsylvania Ave NW #800
Washington, DC, 20006
Telephone:  (310)-595-0800
Email: leklayman@gmail.com
*Counsel for Plaintiff*

## VERIFICATION

I, Laura Luhn, hereby swear under oath and penalty of perjury that the facts contained in this Complaint are true and correct to the best of my personal knowledge and belief.

**Dated**:  April 23, 2019                                  Respectfully Submitted,

Laura Willis Luhn
Plaintiff